IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

GEORGE E. TUCKER,

                                    Plaintiff,

                    vs.                                      Civil Action No.
                                                            6:01-CV-1455 (LEK/DEP)

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

_____

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF

GEORGE E. TUCKER, *pro se*
Corinth, NY 12822

FOR DEFENDANT

HON. GLENN T. SUDDABY          WILLIAM H. PEASE, ESQ.
United States Attorney for the       Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

OFFICE OF GENERAL COUNSEL     BARBARA L. SPIVAK, ESQ.
Social Security Administration       Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278             SUSAN C. BRANAGAN, ESQ.
                                     Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>               REPORT AND RECOMMENDATION</u>

      Plaintiff George E. Tucker, who in November of 1993 was found to be disabled as a result of suffering from idiopathic thrombocytopenia, a listed and presumptively disabling condition, has commenced this proceeding requesting judicial review of a more recent decision of the Commissioner terminating his benefits in light of a finding that his previously-determined disability no longer exists.[1]  That determination was based upon a finding by an Administrative Law Judge ("ALJ"), following a hearing, that in light of his medical improvement, which relates to his ability to work, plaintiff now retains the residual functional capacity ("RFC") to perform a full range of light work.  Based upon that finding the ALJ concluded, in accordance with the applicable provisions of the medical-vocational guidelines (the "grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, that

---

        [1]      Idiopathic thrombocytopenia is defined by one authorative source as a decrease in the amount of platelets "of unknown cause or spontaneous origin." Dorland's Illustrated Medical Dictionary 874, 1836 (29th ed. 2000).

a finding of no disability should be made.

Having reviewed the record, without the benefit of a brief on behalf of the plaintiff detailing his specific objections to the ALJ's decision, I find the Commissioner's determination that his disability no longer exists resulted from application of proper legal principles, and is supported by substantial evidence in the record. Accordingly, I recommend the entry of judgment on the pleadings affirming the Commissioner's determination, and dismissing plaintiff's complaint.

I.    BACKGROUND

Plaintiff is not married, and lives with his mother and stepfather. AT 32. While plaintiff only attended school through the tenth or eleventh grade, he achieved a general equivalency diploma ("GED") while in the army. AT 28.

Plaintiff is not employed, having last worked in or about 1994. *Id.* Plaintiff's past work experiences have included working as a delivery driver and courier, a job requiring him to lift up to one hundred pounds. AT 28-30. Plaintiff stopped working in 1994 because of internal hemorrhaging. AT 28, 30. Plaintiff testified at the hearing that since then he had not engaged in any part-time work and, specifically, had not done

any bartending.  AT 36-37.

While plaintiff testified to suffering from other conditions, including post traumatic stress disorder ("PTSD"), plaintiff's principal condition of significance continues to be thrombocytopenia.  Plaintiff testified regarding the disabling symptoms experienced as a consequence of that blood disorder, including sleeplessness, lack of appetite, bleeding, dizziness, and problems with balance.  AT 31, 36.  Plaintiff also experiences pain in his sciatic nerve, and pain and numbness in his right shoulder.  AT 34-35. Plaintiff testified at an August 23, 2000 hearing that he had recently undergone laser surgery on his right lung, and has residual pain and numbness in his lung which affect his right arm between the shoulder and elbow.  AT 42-43.

From September 15, 1997 until March 22, 2000, plaintiff sought treatment from Dr. Richard W. Pitkin for his thrombocytopenia and ulcer, as well as for routine medical care.  AT 519-20, 722-25.  Dr. Pitkin summarized his treatment of the plaintiff on October 27, 1997, and assessed his ability to work.  AT 529-30.  At that time Dr. Pitkin registered a diagnosis of gastricular disease with hemorrhage, auto-immune thrombocytopenia purpura, and tendinitis of the right arm.  AT 529.  Prior

instructions to stop drinking and smoking were reiterated by Dr. Pitkin, and plaintiff was placed on a restricted diet and given a prescription for Prilosec.  AT 530.  In his October 27, 1997 evaluation, Dr. Pitkin opined that plaintiff was limited to lifting and/or carrying ten pounds and could stand and/or walk for less than two hours in an eight-hour workday, but was not limited in his ability to sit.  AT 526-27.

Dr. Pitkin has opined at various points over time that the plaintiff is disabled, or unable to work.  In August of 1999, for example, Dr. Pitkin discussed with plaintiff the denial of disability benefits, and noted his opinion that plaintiff is disabled.  AT 724.  Additionally, on January 10, 2000, Dr. Pitkin examined plaintiff for purposes of a disability determination and noted that he complains of leg pain, but does light yard work.  AT 725.  Dr. Pitkin prepared an earlier evaluation of plaintiff's capabilities on March 13, 1999, at that time opining that Tucker was limited to lifting and/or carrying ten pounds infrequently, and could stand and walk less than two hours as a result of his history of stomach surgery, ulcers, and chronic hematology difficulty.  AT 528.  On May 12, 1999, Dr. Pitkin observed that plaintiff is "disabled and still under Physician[']s care and observation."  AT 585.

The treatment of plaintiff's physical condition over time has also included visits to other physicians and hospitals.  Plaintiff presented at the Saratoga Hospital emergency room on April 3, 1997.  AT 287-89.  On that occasion Tucker reported that he had taken erythromycin recently for a tooth abscess, but stopped because it upset his stomach.  AT 321.  Tucker also noted that while tending bar a few nights earlier, he had consumed approximately six drinks.  *Id.*  Examining physicians reported normal results with the exception of heartburn and mild conjunctival pallor.  AT 288, 322.  Plaintiff was diagnosed with gastrointestinal bleeding and thrombocytopenia.  AT 323.  Dr. Arthur Ostrov performed an endoscopy, revealing a bleeding ulcer in plaintiff's stomach which was successfully treated with injection and cauterization.  AT 287.  Plaintiff was given platelet transfusions and prescribed Prilosec and Pepcid, a report of that visit noting that the Prilosec had afforded him some relief.  AT 289.  It was noted that plaintiff had not contacted the Veterans' Administration for medications, and additionally that several physicians had advised him to stop smoking and drinking alcohol.  *E.g.*, AT 287, 289, 312.  Dr. Ostrov noted that plaintiff clearly has an issue as to compliance with those directives.  AT 289; *see also* AT 312.

Plaintiff saw Dr. Ostrov for a follow-up esophagogastro-duodenoscopy on June 4, 1997.  AT 292.  On that occasion Dr. Ostrov diagnosed plaintiff's status as post gastrectomy, prescribing more Prilosec and noting that Tucker still had not made contact with the VA to obtain medication.  AT 292-93.  The doctor further noted that plaintiff had not stopped smoking or drinking alcohol or coffee, and stated that he "clearly should stop smoking, stop drinking, stop using coffee."  *Id.*

Dr. Michael G. Holland examined plaintiff on January 22, 1998.  AT 467-69.  Dr. Holland reported that plaintiff was tremulous and hyperreflexic, symptoms attributed by the doctor to mild alcohol withdrawal.  *Id.*  Dr. Holland's examination was otherwise normal.  *Id.* Plaintiff's platelet count was recounted as 97,000.  AT 470.  On that occasion plaintiff reported that he took Prilosec only sporadically, because he could not financially afford to take it on a regular basis.  AT 468. Tucker also acknowledged that he had not complied with doctors' requests to stop smoking and drinking coffee.  *Id.*

Plaintiff was admitted to Saratoga Hospital from July 29 to July 31, 1998, with complaints of blood in his stool and coffee ground emesis.  AT 573-74, 730.  At that time plaintiff's platelet count was recorded as 92,000.

AT 573.  Plaintiff reported generalized discomfort of the upper quadrants of his abdomen.  *Id.*  X-rays taken of his chest and abdomen, however, were normal.  *Id.*  Plaintiff was diagnosed on that occasion with gastrointestinal bleeding and idiopathic thrombocytopenia purpura.  *Id.*

Plaintiff was re-admitted to Saratoga Hospital from August 6 to August 11, 1998.  AT 730-37.  Notes of that visit indicate plaintiff was admitted for severe anemia which had developed because of his failure to comply with directions of his treating physicians, and because he was bleeding more acutely following his last discharge less than a week earlier.  AT 730-31.  The anemia was successfully remedied through blood transfusions.  AT 730.  Dr. Ostrov performed a colonoscopy and polypectomy on August 7, 1998 and removed a colonic polyp, but found no active gastrointestinal bleeding.  AT 575-76.  Results of an x-ray of plaintiff's small intestine on August 10, 1998 were normal.  AT 735.  Dr. Pitkin noted that plaintiff improved steadily after the removal of the polyp, and showed no signs of further bleeding.  AT 731.  At discharge, plaintiff's platelet count was 117,000.  AT 730.  Dr. Pitkin instructed plaintiff to stop drinking and smoking and adhere to a bland diet.  AT 731-32.

Plaintiff was once again admitted to Saratoga Hospital from August

31 until September 17, 1998, this time for treatment of pneumonia.  AT 577-82, 653-57.  A chest x-ray revealed an effusion and/or infiltrate at the base of the right lung.  AT 577-78, 654.  Plaintiff's platelet count was recorded as 126,000.  AT 578, 653.  Plaintiff underwent a thoracoscopy for drainage on September 10, 1998.  AT 582, 654.  At discharge, plaintiff's platelet count was 148,000.  AT 653.  Dr. Pitkin stated on discharge that plaintiff could perform activities on an "as tolerated" basis. AT 655.

Dr. Rodney L. Ying provided follow-up treatment to plaintiff on September 29 and November 10, 1998.  AT 620-21.  Dr. Ying noted mostly normal examination results, with no cough, fever, chills, hemoptysis or dyspnea on September 29.  AT 621.  A chest x-ray revealed diminishing right pleural abnormalities.  AT 621, 658.  On November 10, plaintiff had diminished breath sounds and no wheezes or rales, findings which Dr. Ying noted as reflecting improvement.  AT 620. A chest x-ray revealed near complete resolution of the pleural effusion. *Id.*  Dr. Ying suggested no intervention, and returned plaintiff to Dr. Pitkin's care.  *Id.*

Plaintiff went to the emergency room of Saratoga Hospital on

October 3, 1999, complaining of weakness, dizziness and vomiting.  AT 705-15.  The examining physician noted that at the time plaintiff was hyperventilating, but not vomiting.  AT 712.  Plaintiff also showed no guarding or localized tenderness in his abdomen.  AT 712-13.  Plaintiff's platelet count was recorded at the time at 69,000.  AT 713.  An EKG revealed no acute ischemic changes.  *Id.*  The examining doctor diagnosed plaintiff as suffering from acute gastritis and hyperventilation.  *Id.*  Plaintiff was treated with Phenergan IV, and hydrated.  *Id.*  Tucker ultimately became asymptomatic, and was discharged.  *Id.*

Plaintiff again went to the emergency room of Saratoga Hospital on March 20, 2000, and was admitted until March 22, 2000.  AT 689-704.  On that occasion examining physicians reported normal results, with the exception of severe tenderness at the right upper quadrant of plaintiff's abdomen.  AT 690.  A CT scan of plaintiff's abdomen revealed some mildly distended small bowel loops, but was otherwise normal.  AT 691.  Plaintiff's chest x-ray was normal, and his platelet count was found to be 145,000.  AT 693-94.  Plaintiff was diagnosed with acute gastritis, acute abdominal pain, possible viral gastroenteritis and status post partial gastric resection.  AT 690, 698, 702, 704.  An examination performed on

March 21, 2000 was normal, with the exception of prolonged expiratory phase with some mild crackles bibasilarly.  AT 697.  Plaintiff's platelet count on this occasion was 145,000.  AT 697-98.  Notes from that hospital visit revealed that plaintiff's pain had resolved after taking medication.  AT 697.  The examining physician noted that plaintiff's pain was possibly from an obstruction attributable to multiple abdominal surgeries, and recommended an upper gastrointestinal x-ray, small bowel follow through and repeat esophagogastroduodenoscopy.  AT 698.

Plaintiff had an upper gastrointestinal, small bowel x-ray on March 28, 2000.  AT 669.  That x-ray revealed post-surgical changes, but was otherwise normal.  *Id.*

Plaintiff was examined by Dr. Joseph B. Cavallaro, a gastroenterologist, on April 4, 2000.  AT 666.  At that time plaintiff complained of dysphagia (restricted swallowing), mainly in the morning.  AT 666.  The examination was normal.  *Id.*  A video swallowing study performed on April 11, 2000 was also normal, except to note that plaintiff's laryngeal excursion was diminished, and he had trouble clearing thicker consistencies from the valleculae.  AT 668.  Dr. Cavallaro recommended an esophagogastroduodenoscopy.  AT 666.

Plaintiff returned to Dr. Ostrov on May 3, 2000, continuing to complain of dysphagia, mostly involving pills.  AT 664-65.  Dr. Ostrov noted that the results of plaintiff's video swallowing test were consistent with his complaints, and recommended that plaintiff have his largest meal at mid-day.  *Id.*

Plaintiff visited Dr. Ostrov on June 13, 2000, again complaining of dysphagia, principally affecting his ability to ingest pills, as well as recent weight loss and muscle wasting.  AT 663.  Dr. Ostrov performed an esophagogastroduodenoscopy on June 21, 2000, revealing no evidence of any significant lesion of the esophagus.  AT 687.  Dr. Ostrov recommended that plaintiff try consuming small meals at night.  *Id.*

Plaintiff saw Dr. Ostrov again on July 7, 2000 to discuss his colonic polyps and his desire for a colonoscopy.  AT 659-60.  Dr. Ostrov noted the endoscopy had shown no gross lesion.  AT 659, 687.  A review of systems at that time proved satisfactory, and plaintiff's severe gastritis appeared to have been resolved.  AT 659-60.  Plaintiff was doing reasonably well, and Dr. Ostrov therefore recommended waiting one year for a colonoscopy.  AT 660.

In addition to intensive treatment for his internal conditions, plaintiff has over time been examined and treated psychiatrically.  On February 18, 1998, James P. Thalmann, Ph.D., performed a psychiatric examination of plaintiff.  AT 471-73.  Dr. Thalmann noted plaintiff's history of PTSD, finding that plaintiff exhibited discreet symptoms of the condition, including being easily startled and experiencing nightmares, but noted that they were "not intrusive on his day to day functioning."  AT 471-72.  According to Dr. Thalmann, plaintiff had clear speech and organized thought processes, with no significant anxiety, distress or depression.  AT 472.  Dr. Thalmann found plaintiff's mood to be generally euthymic, and his intellectual functioning dull but normal.  *Id.*  Plaintiff's concentration and judgment for daily events was intact, according to the report, and he followed questions and instructions.  *Id.*  Plaintiff was noted to be competent for all activities of daily living, and until the time of his stomach surgery, functional for competitive employment.  *Id.*  Dr. Thalmann diagnosed plaintiff as suffering PTSD, as well as a mild personality trait disturbance, sub-clinical to personality disorder, but with authority conflict and dependent traits.  *Id.*  Dr. Thalmann opined that plaintiff's principal attributions of blood disorder leave him unable to work, but he is fully

competent to manage benefits, also noting that plaintiff appeared to have

motivational difficulties.  *Id.*

In addition to his treating sources, plaintiff and/or his records were

examined by various consultants.  Dr. Richard Finley, a state agency

consulting physician, completed a physical RFC assessment on April 3,

1998.  AT 477-84.  Dr. Finley opined that plaintiff can lift up to fifty pounds

occasionally, and twenty-five pounds frequently; and can stand and/or

walk for six hours, and can sit for about six hours, in an eight-hour day.

AT 478.  Dr. Finley specifically noted that plaintiff is limited to medium

work because of a history of gastrointestinal bleeding, abdominal surgery,

chronic history of ulcers and hematological problems.  *Id.*  The consultant

also dismissed Dr. Pitkin's October 27, 1997 opinion as being based on

anemia which was no longer present and not likely to recur, and not

supported by the medical evidence on record.  AT 483.

Dr. H. Berliss, a state agency consulting physician, completed a

mental residual functional capacity assessment of the plaintiff's condition

on April 6, 1998.  AT 506-17.  Dr. Berliss acknowledged Dr. Thalmann's

diagnosis of mild PTSD and personality trait disturbance, finding that

plaintiff has no significant functional limitations except for a moderate

-14-

limitation in his ability to accept instructions and respond appropriately to criticism from supervisors.  AT 516.

William H. Clements, Ph.D., performed a psychiatric consultative examination and intellectual evaluation of plaintiff on June 9, 1998.  AT 548-50.  Intelligence testing by Dr. Clements yielded results falling outside within the low normal range.  AT 549.  Plaintiff's mood was found to be neutral and affect varied and appropriate, and he appeared oriented in three spheres.  *Id.*  Plaintiff's immediate memory was noted to be good, and he was well ego-involved, cooperative, trying his best, and persistent, which the doctor noted made the results valid and reliable.  *Id.*  Dr. Clements confirmed a diagnosis of PTSD, which he noted did "not appear particularly impairing" and opined that plaintiff evidenced little, if any, motivation to change his life.  AT 550.

On August 8, 2000, Dr. Pitkin assessed plaintiff's ability to perform physical and mental work-related activities.  AT 717-21.  At that time Dr. Pitkin opined that plaintiff could lift and/or carry less than ten pounds; and could stand and/or walk for less than two hours, and sit for less than six hours, in an eight-hour day.  AT 717-18.  According to Dr. Pitkin's assessment, plaintiff is limited in his ability to push and pull due to pain in

his right shoulder and sciatic nerve; he should never perform postural activities due to pain; and his manipulative abilities are limited due to numbness.  AT 718-19.  Dr. Pitkin also noted that plaintiff is limited in his ability to hear and see, and is additionally limited in all environmental areas.  AT 719.

Dr. Pitkin further opined that plaintiff is limited in his ability to understand, remember, and carry out instructions, and to respond appropriately to supervision, co-workers and work pressures in a work setting.  AT 720-21.  He also opined that plaintiff has either a poor or fair ability in most mental work-related categories.  AT 720-21.  Dr. Pitkin did observe, however, that plaintiff has a good ability to adhere to basic standards of neatness and cleanliness and to carry out short, simple instructions.  AT 720-21.

During the hearing conducted by the agency, plaintiff described the various activities which are included in his daily life.  Tucker stated that he sweeps floors, washes dishes and does whatever else he can to help out around the house.  AT 32.  Plaintiff attempts to mow the lawn.  AT 32-33.  He is able to drive a car, but does so infrequently.  AT 31.  Tucker frequently walks to his post office box across a bridge over the Hudson

River.  AT 32.  Plaintiff watches television, plays cards and goes fishing, but states that "the system would object if I got too active."  AT 550.  Plaintiff fishes for trout in the Hudson River, and goes deer hunting with a .308 millimeter rifle.  AT 33-34.

The recorded treatment of plaintiff's physical condition has included frequent testing to measure his blood platelets.  Prior to the determination of disability in July, 1994, laboratory test reports showed repeatedly low platelet counts; while a normal range is apparently approximately 150,000 to 450,000, plaintiff's platelets were measured at 48,000 on December 11, 1993 (AT 375); 60,000 on December 12, 1993 (*id.*); 66,000 on December 19, 1993 (AT 373); 34,000 on May 16, 1994 (AT 248); 40,000 on June 1, 1994 (AT 242); and 39,000 on June 14, 1994 (AT 241).  Medical evidence in the record during the period relevant to the continuing disability review show plaintiff's platelet counts were measured at 99,000 on May 14, 1997 (AT 290); 97,000 on January 22, 1998 (AT 470); 122,000 on May 20, 1998 (AT 522); 112,000 on July 16, 1998 (AT 679); 92,000 on July 29, 1998 (AT 573); 126,000 on August 31, 1998 (AT 578); 85,000 on May 6,1999 (AT 676); 69,000 on October 3, 1999 (AT 713); 145,000 on March 20, 2000 (AT 697-98); 109,000 on June 1, 2000 (AT 662); and 122,000 on

November 11, 2000 (AT 678).

II.   PROCEDURAL HISTORY

A.   Initial Agency Determination

Plaintiff initially applied for disability insurance benefits under the Act on December 20,1993, claiming disability based upon a combination of conditions, including a mental disorder and blood condition, with an alleged onset date of December 31, 1989.  AT 49-51, 65.  That application was initially denied on April 11, 1994.  AT 56.  Explaining that determination, the agency wrote that following hospitalization for his physical difficulties plaintiff's condition had stabilized, and it was determined that collectively, they were not sufficiently severe to prevent him from working.  AT 59.

Following plaintiff's request for reconsideration of that determination, which included further description of his abdominal difficulties, the earlier finding of no disability was reversed by a determination dated July 29, 1994, and plaintiff was found to be disabled as of November 1, 1993.  AT 60, 62-64.  In that reconsideration determination plaintiff's condition was listed as a duodenal ulcer, secondary to the primary diagnosis of idiopathic thrombocytopenia, and he was found to meet or equal Listing

7.06A of the regulations' listing of presumptively disabling conditions.  AT

62; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

      B.    Subsequent Proceedings Before the Agency

      Apparently as a result of continuing, periodic review of plaintiff's

disability status, on April 3, 1998 a determination was issued by the

agency finding that in light of improvement of his medical condition,

plaintiff was no longer disabled.  AT 96.  Plaintiff's request for review of

that determination resulted in a hearing, held on May 21, 1998, and the

subsequent issuance of a determination concurring in the earlier finding of

no disability, as of April 30, 1998.  AT 112-21.  That determination was

based upon the hearing officer's finding that despite his conditions plaintiff

retained the RFC to stand, walk and sit six hours in an eight hour day, and

to lift ten pounds frequently and twenty-five pounds occasionally.  AT 115.

At plaintiff's request, a hearing was conducted before an ALJ J. Lawson

Brown on May 14, 1999 to address that finding of no disability.  AT 24-38.

Following that hearing, ALJ Brown issued a decision, dated June 24,

1999, endorsing the finding of no disability as of April 30, 1998, effective

on June 30, 1998.  AT 589-603.

      On review pursuant to plaintiff's request, the Social Security

Administration Appeals Council remanded the matter for further consideration on June 23, 2000.  AT 606-09.  That reversal and remand was based upon the Appeals Council's finding that the ALJ's determination did not adequately set forth the rationale leading to that determination, and further based upon the ALJ's failure to set forth a detailed, "point-by-point comparison" of the impairments found at the time of disability and those extant at the time of the disability's cessation.  AT 608.

A second hearing was subsequently held before ALJ Brown on August 23, 2000.  AT 39-48.  At that hearing, unlike the situation at the first hearing, plaintiff was represented by counsel.  *Compare* AT 26 *with* 39.  After the conclusion of that hearing ALJ Brown issued a decision dated February 22, 2001, finding that plaintiff was no longer disabled.  AT 12-22.  In his decision, while ALJ Brown reviewed the evidence leading to the earlier finding of disability, he did not specifically discuss the regulatory framework associated with medical improvement, instead employing an amalgamated version of that standard and now-familiar five step disability test.  The ALJ first determined at step one that plaintiff had not engaged in substantial gainful activity during the relevant time period.

AT 15.  ALJ Brown then skipped to step three of the controlling test, concluding that the plaintiff did not have any physical or mental impairment which met or equaled any applicable listing.  AT 15-16.  ALJ Brown next discussed medical improvement, finding both the existence of medical improvement and that the improvement "significantly affects [claimant's] ability to work."  AT 16.

Essentially reverting to step two of the sequential analysis, ALJ Brown then examined plaintiff's physical and mental limitations, finding that he does suffer from a severe impairment or combination of impairments, including both severe thrombocytopenia and a significant mental condition, the ALJ noting with regard to plaintiff's mental status that he has been diagnosed as suffering from PTSD, although it has been characterized as "mild" and not considered to be incapacitating.  AT 16-17.  In arriving at that conclusion ALJ Brown also examined the record relative to the plaintiff's complaints of back and right shoulder pain, but rejected them as insufficiently severe to result in significant work-related limitations of function.  AT 17-18.

ALJ Brown then went on to find that despite his limitations, plaintiff retains the RFC to perform a full range of light work.  AT 18.  In arriving at

-21-

that conclusion ALJ Brown specifically rejected contrary RFC opinions of

Dr. Richard W. Pitkin, M.D., plaintiff's treating physician, related to his

physical limitations, as well as plaintiff's subjective testimony.  AT 18-20.

Having established plaintiff's RFC, ALJ Brown next concluded that

he was incapable of returning to his past relevant work as a delivery driver

in light of the heavy exertional requirements associated with that position.

AT 20.  ALJ Brown then proceeded to apply the grid, 20 C.F.R. Pt. 404,

Subpt. P, App. 2, finding that the relevant portion of the grid directed a

finding of disability within the meaning of the Act.  AT 20.  ALJ Brown's

decision became a final determination of the agency when, on August 10,

2001, the Appeals Council denied plaintiff's request for review.  AT 6-7.

C.    This Action

Plaintiff commenced this action on September 20, 2001.  Dkt. No. 1.

Issue was thereafter joined by the filing of an answer, accompanied by an

administrative transcript of the proceedings before the agency, on behalf

of the Commissioner on February 28, 2002.  Dkt. Nos. 9, 10.  With the

submission of a brief by the Commissioner on October 11, 2002 (Dkt. No.

16), coupled with plaintiff's failure to submit a brief to the court and the

passage of the deadline for doing so, this matter is now ripe for

-22-

determination, and has been referred to me for the issuance of a report

and recommendation, pursuant to Northern District of New York Local

Rule 72.3(d) and 28 U.S.C. § 636(b)(1)(B).[2,3]  *See also* Fed. R. Civ. P.

72(b).

III.    DISCUSSION

      A.    Scope Of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is limited; that review requires a determination of whether

the correct legal standards were applied, and whether the decision is

supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586

(2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal

v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F.

---

[2]    This matter has been treated in accordance with the procedures set forth
in General Order No. 18 (formerly, General Order No. 43) which was issued by the
Hon. Ralph W. Smith, Jr., Chief United States Magistrate Judge, on January 28, 1998,
and amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on
September 19, 2001.  Under that General Order an action such as this is considered
procedurally, once issue has been joined, as if cross-motions for judgment on the
pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure.

[3]    The court is obviously disadvantaged, in reviewing this matter, by
plaintiff's failure to submit a brief outlining the arguments in support of his request for
reversal of the Commissioner's determination.  Despite this shortcoming, in light of
plaintiff's *pro se* status I have considered the record and ALJ Brown's determination
and attempted to address any argument which ostensibly could be made on behalf of
the plaintiff in support of his request for reversal.

Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, her decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative

-24-

record.  *Id.*; *Martone*, 70 F. Supp.2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp.2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Secretary of Dep't of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without

remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Secretary of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

     B.    <u>Disability Determination - The Five Step Evaluation Process</u>

The Social Security Act defines "disability" to include the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months [.]"  42 U.S.C. § 423(d)(1)(A).   In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments which significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled".  *Martone*, 70 F. Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If it

is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work.  *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584.  Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work.  *Perez*, 77 F.3d at 46.  In deciding whether that burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp.2d at 150.

### C.    Standard For Termination Of Benefits

In a case such as this, where a finding of disability has resulted in the granting of benefits under the Act, the Commissioner is statutorily charged with the duty to engage in a continuing, periodic review of the claimant's condition.  42 U.S.C. § 421(i); *see also* 42 U.S.C. § 425(a).  If, based upon that review, the Commissioner determines that the disabling condition has subsided, does not exist, or is not disabling, a termination of benefits may be ordered.  42 U.S.C. § 423(f).  In making a review to

determine whether cessation of benefits is warranted, the Commissioner must examine the claimant's "current" condition – a term ordinarily requiring assessment of the plaintiff's condition at the time of the hearing.[4] *Difford v. Secretary of Health & Human Servs.*, 910 F.2d 1316, 1320 (6th Cir. 1990).

Generally speaking, termination of benefits is appropriate under section 423(f) and the corresponding regulations when 1) there has been medical improvement related to the claimant's ability to work; 2) the claimant has benefitted from advances in medical or vocational technology related to the ability to work, regardless of the lack of medical improvement; 3) the claimant has undergone vocational therapy related to ability to work; 4) based on new or improved diagnostic or evaluative techniques it is demonstrated that claimant's condition was not as disabling as previously regarded; or 5) substantial evidence shows that an earlier finding of disability was erroneous.[5]  42 U.S.C. 423(f); 20 C.F.R. §§

---

[4]     As an exception to this general rule, in cases where disability benefits under Title II have been terminated and the claimant's insured status ended prior to the hearing date, the critical date is the last date of insured status.  *Henley v. Commissioner of Soc. Sec.*, 58 F.3d 210, 212-13 (6th Cir. 1995), *cert. denied sub nom*, *Henley v. Chater*, 516 U.S. 1081, 116 S. Ct. 792 (1996).

[5]     The regulations also provide that if the claimant is engaged in substantial gainful activity – a factor which under the five step test would ordinarily result in a

404.1594(d), 416.994(b)(3).

    D.    <u>The Evidence In This Case</u>

    Judicial review of the ALJ's determination in this matter implicates several well-defined legal principles and requires careful analysis of the record as it relates to each of those issues.

    1.    <u>RFC Determination</u>

    Pivotal to the ALJ's finding that plaintiff is no longer disabled is his determination that plaintiff retains the ability to perform light work involving lifting not more than ten pounds frequently and twenty pounds occasionally.  Plaintiff challenges this finding as contradicted by the record, including based on the limitations associated with his mental impairments.[6]

———————————

finding of no disability – termination of benefits is warranted.  20 C.F.R. § 404.1594(d); *see also* 42 U.S.C. § 423(f).  This can include part-time employment with earning levels sufficient to trigger the rebuttable presumption of substantial gainful activity, permitting termination of benefits even without a showing of medical improvement. *Katz v. Secretary of Health & Human Servs.*, 972 F.2d 290, 292-94 (9th Cir. 1992).  As will be seen, the record now before the court suggests that plaintiff may have worked as a bartender during the relevant period.  *See* p. 42 n. 11, *post.*

    [6]    Light work involves

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to

A claimant's RFC represents a finding of the range of tasks he or she is capable of performing notwithstanding the impairments at issue.  20 C.F.R. § 404.1545(a).  An RFC finding is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis.  *Id.*; *Martone*, 70 F.Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. § 404.1569a.  Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered.  20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e).  When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice.  *Martone*, 70 F.Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587).  An administrative RFC finding can withstand judicial scrutiny only if there is

---

do substantially all of these activities.

20 C.F.R. § 404.1567(b).

substantial evidence in the record to support each requirement listed in the regulations. *Martone*, 70 F.Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.Supp. 300, 309-10 (E.D.N.Y. 1997).

In making his RFC finding, ALJ Brown drew support from the reports and opinions of treating and examining sources and state agency physicians. Dr. H. Berliss, for example, assessed plaintiff as not limited by mental impairment except for slight restrictions in his ability to maintain social functioning. AT 506-18. James Thalmann, Ph. D., and William H. Clements, Ph. D., each also evaluated plaintiff's mental status, finding that his PTSD did not appear to prevent him from working. *See* AT 471-73, 548-50. In his report Dr. Thalmann found that plaintiff's PTSD did "not appear to be incapacitating," although finding him susceptible of benefit from psychiatric intervention. AT 473. Similarly, Dr. Clements noted that the PTSD diagnosis was applicable though the condition "does not appear particularly impairing." AT 550.

It is true that under certain circumstances a mental condition which is not itself disabling can constitute a nonexertional impairment to be considered in assessing a claimant's RFC and, in this case, Tucker's

ability to perform a full range of light work for purposes of application of the grid.  *See*, *e.g.*, *Samuels v. Barnhart*, No. 01 Civ. 3661, 2003 WL 21108321, at *12-*13 (S.D.N.Y. May 14, 2003).  In this instance, however, there is no indication of any such limitation stemming from plaintiff's PTSD.

### 2.    Treating Physician

In arriving at his RFC determination the ALJ discounted opinions of plaintiff's treating physician, Dr. Richard W. Pitkin, including a report dated October 24, 1997 finding that plaintiff could stand and walk for less than two hours and could not lift more than ten pounds occasionally in light of his impairments.  *See* AT 18.  The ALJ also considered but rejected an RFC form completed by Dr. Pitkin on August 8, 2000, reflecting several limitations incompatible with the light work RFC finding.  AT 18-19.

_____Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[7]  *Veino*, 312 F.3d at 588;

---

[7]         The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions
> from your treating sources . . . If we find that a

*Barnett*, 13 F. Supp.2d at 316.  Such opinions are not controlling, however, if contrary to other substantial evidence in the record.  *Veino*, 312 F.3d at 588.  Where conflicts arise in the form of contradictory medical evidence, their resolution is properly entrusted to the Commissioner.  *Id.*

In deciding what weight, if any, an ALJ should accord to medical opinions, he or she may consider a variety of factors including "[t]he duration of a patient-physician relationship, the reasoning accompanying the opinion, the opinion's consistency with other evidence, and the physician's specialization or lack thereof[.]"  See *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527, 416.927).

When a treating physician's opinions are repudiated, the ALJ must

_____

treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.   When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Failure to apply the appropriate legal standards for

considering a treating physician's opinions is a proper basis for reversal

and remand, as is the failure to provide reasons for rejection of his or her

opinions.  *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp.2d at 316-17.

As was noted by ALJ Brown, Dr. Pitkin's opinions do not appear to

be well-supported, and are at odds with clinical evidence in the record as

well as accounts of plaintiff's activities.  It is true that on May 12, 1999 Dr.

Pitkin issued a terse one-sentence memorandum, addressed "To Whom It

May Concern", reporting that "Mr. Tucker is disabled and still under

Physicians [sic] care and observation."  AT 585.  That memorandum was

followed by another, similar note, dated August 21, 2000.  AT 828.  Those

opinions, however, are entitled to no weight since they opine on a matter

specifically reserved to the Commissioner.  *See Snell v. Apfel*, 177 F.3d

128, 133 (2d Cir. 1999); 20 C.F.R. § 404.1527(e).

Dr. Pitkin's naked assertions regarding disability are also

meaningless, in that they do not offer any explanation as to the criteria

used or the basis for that conclusion.  Dr. Pitkin's office notes for the

period of September 15, 1997 through March 22, 2000 reflect that

-35-

examinations were not frequently performed. *See*, *e.g.*, AT 519-20, 722-25. Indeed, although Dr. Pitkin rendered opinions regarding plaintiff's physical RFC on October 27, 1997, *see* AT 526-27, and again on March 13, 1998, *see* AT 528, he noted that the last occasion upon which he saw the plaintiff prior to rendering those opinions was February of 1997. AT 528. Although Dr. Pitkin does purport to rely on blood tests, x-rays and other objective test results, *e.g.*, 290, 470, 522, 523, 573, 578, 662, 668, 676, 678, 679, 693, 697-98, 713, 735, those do not support his opinion that plaintiff's physical work-related abilities are restricted. And, although plaintiff complained of numbness in his right arm, the record contains no medical evidence of such limitation. Moreover, there is no evidence in the record supporting any limitation in plaintiff's ability to hear and see, as is also noted. Indeed, as the ALJ noted, the only area in which Dr. Pitkin does not find a limitation with regard to the plaintiff is in the area of speaking. *See* AT 719. The vast majority of Dr. Pitkin's opinions regarding limitations including, for example, to push, pull, manipulate with hands, see, hear, balance, climb, bend, stoop, crawl, kneel, and the area of exposure to environmental factors, are wholly lacking in any support from the record. AT 717-19.

In contrast to Dr. Pitkin's findings, the assessment of Dr. Robert Finley, a state agency physician, indicates that plaintiff could perform tasks equivalent to a medium level of exertion.[8]  AT 478.  Specifically, Dr. Finley assessed that plaintiff can lift up to fifty pounds occasionally and twenty-five pounds frequently; and can stand and/or walk for six hours, and sit for about six hours, in an eight-hour day.  AT 478.  The limitation to medium work was based on plaintiff's history of gastrointestinal bleeding, abdominal surgery, chronic history of ulcers and hematology problems. *Id.*

Dr. Finley's assessment is consistent with other medical evidence in the record.  Physical examinations performed by various doctors during plaintiff's inpatient treatment were normal with the exception of symptoms associated with his admission.  AT 288, 322, 573, 689-90, 712-13.  Follow-up visits generally indicated similarly normal results.  AT 621, 666.  Dr. Michael Holland, a consultative physician, also reported normal examination results, with the exception of symptoms associated with alcohol withdrawal.  AT 467-69.  Aside from reports associated with

---

[8]       Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to twenty-five pounds.  20 C.F.R. § 404.1567(c).

plaintiff's pneumonia, chest and abdominal x-rays were normal.  AT 573, 691, 693, 735.

Based upon the record, it appears that Dr. Finley's opinions are fully consistent with the objective, medical evidence.  State agency medical consultants are highly qualified physicians who are experts in the evaluation of the medical issues in disability claims under the Social Security Act, and accordingly, their opinions must be considered; such assessments can constitute substantial evidence when supported by other evidence in the record.  20 C.F.R. § 404.1527(f); SSR 96-6p; *Diaz v. Shalala*, 50 F.3d 307, 313 n.5 (2d Cir. 1995).  The ALJ's finding that plaintiff can perform light work is fully consistent with Dr. Finley's assessment for a medium level of exertion; if an individual is found able to do medium work, he or she is also capable of performing sedentary and light work as well.  20 C.F.R. § 404.1567(c).

### 3.    Subjective Complaints of Pain

In arriving at his determination ALJ Brown rejected plaintiff's subjective testimony concerning his limitations as being "completely out of proportion to the medical evidence."  AT 20.

An ALJ must take into account subjective complaints of pain in

making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d),

416.929(a), (d).  When examining the issue of pain, however, the ALJ is

not required to blindly accept the subjective testimony of a claimant.

*Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp.2d at 151 (citing *Marcus*).

Rather, an ALJ retains the discretion to evaluate a claimant's subjective

testimony, including testimony concerning pain.  *See Mimms v. Heckler,*

750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that

discretion the ALJ must consider a variety of factors which ordinarily

would be relevant on the issue of credibility in any context, including the

claimant's credibility, his or her motivation, and the medical evidence in

the record.  *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL

59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.)

(citing *Marcus*, 615 F.2d at 27-28)).  In doing so, the ALJ must reach an

independent judgment concerning the actual extent of pain suffered and

its impact upon the claimant's ability to work.  *Id.*

When such testimony is consistent with and supported by objective

clinical evidence demonstrating that claimant has a medical impairment

which one could reasonably anticipate would produce such pain, it is

entitled to considerable weight.[9]  *Barnett*, 13 F. Supp.2d at 316; *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony concerning the intensity, persistence or functional limitations associated with his or her pain is not fully supported by clinical evidence, however, then the ALJ must consider additional factors in order to assess that testimony, including: 1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and

_____

[9]  In the Act, Congress has specified that a claimant will not be viewed as disabled unless he or she supplies medical or other evidence establishing the existence of a medical impairment which would reasonably be expected to produce the pain or other symptoms alleged.  42 U.S.C. § 423(d)(5)(A).

whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Secretary, Dep't of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

It may be, as plaintiff asserts, that he does suffer from some degree of discomfort as a result of his condition.  The fact that he suffers from discomfort, however, does not automatically qualify him as disabled, since "disability requires more than mere inability to work without pain." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

Plaintiff's testimony regarding subjective complaints of pain and other symptomology which would have impaired his ability to work was extremely limited.  Plaintiff testified during the hearing that he experiences right shoulder pain, but that aside from taking pain medication he is not receiving treatment for that condition.[10]  AT 34-35.  Plaintiff also testified that as a result of his blood disorder he experiences dizziness, though it has never caused him to pass out.  AT 36.  Plaintiff also experiences pain

---

[10]     There is an absence of evidence in the record regarding any significant treatment of plaintiff's right shoulder pain.

in the area of the right lung, for which he takes pain pills, and additionally experiences difficulties in swallowing.  AT 43-44.

The ALJ's rejection of this testimony as suggesting a limitation upon plaintiff's ability to work is supported by the record, particularly in view of plaintiff's reported activities.  According to the plaintiff he is able to sweep floors, wash dishes, and otherwise help his mother and stepfather around the house.  AT 32-33, 725.  Plaintiff is able to drive, and frequently walks to his post office box across a bridge over the Hudson River.  AT 32. Plaintiff watches television and plays cards, but stated to an examining physician that "the system would object if I got more active."  AT 550. Plaintiff has a fishing license and goes fishing in the Hudson River for trout.  AT 33.  Plaintiff also is a deer hunter, and uses a .308 millimeter rifle.  *Id.*  The record also suggests, although is unequivocal regarding, the fact that plaintiff may have engaged during the relevant time in part time work as a bartender.[11]  *See* AT 321.

In addition to his daily activities, the ALJ also considered evidence

---

[11]      During one of the hearings claimant was specifically asked whether he had worked as a bartender since leaving his courier position.  AT 36-37.  In response to that questioning Tucker firmly denied having performed such work.  *Id.*  That response is seemingly contradicted by a Saratoga Hospital record which appears to reflect that in April of 1997 plaintiff was engaged in bartending activities.  *See* AT 321.

demonstrating that plaintiff has been repeatedly told by physicians to stop

drinking and smoking, to stop drinking coffee, and to adhere to a bland

diet.  *See e.g.,* AT 287, 292, 468, 530, 731.  Plaintiff has admitted,

however, on several occasions that he has failed to comply with those

directives, having stated to Dr. Holland on January 22, 1998 that he had

not stopped smoking, drinking alcohol or coffee, AT 468, and testified

during a hearing on May 14, 1999 that he drinks beer when he wants.  AT

31, and again on August 23, 2000 that he still drinks alcohol, AT 46.  In

addition, plaintiff continues to smoke at least one pack of cigarettes

daily.[12]  AT 46, 725.

The record also reflects that plaintiff fails to take his medications as

prescribed.  Plaintiff acknowledged, for example, taking Prilosec only

sporadically.  AT 468.  Twice it was noted that he had not arranged to

receive the prescribed medication through the Veteran's Administration

despite having been instructed by physicians to do so.  *See* AT 289, 293.

Plaintiff also acknowledged his noncompliance in August of 1998 when

admitted for severe anemia which developed because he was bleeding

---

[12]      Plaintiff also reported to physicians during an emergency room visit on
April 3, 1997 that while bartending a few nights earlier he had consumed six drinks.
AT 321.

more acutely than when discharged less than a week earlier.  AT 730.

The well documented fact that plaintiff has not taken prescribed medication or followed a prescribed course of treatment mitigates against the granting of an application for disability benefits.  *Thorne v. Schweiker*, 694 F.2d 170, 171 (8th Cir. 1982); *Torres Gutierrez v. Secretary of Health, Ed. & Welfare*, 572 F.2d 7, 8 (1st Cir. 1978).  More significantly, perhaps, those indicators of noncompliance suggest that plaintiff's symptoms are not severe as claimed by him.

In sum, I find that ALJ's rejection of plaintiff's subjective claims of disabling symptoms as not credible was properly explained, and is supported by substantial evidence in the record.

    4. Use Of The Grid

At step five of the analysis, at which point the burden shifts to the Commissioner to show the availability of jobs in the national economy capable of being performed by the claimant, the ALJ applied the grid to arrive at a determination of no disability.

Ordinarily, the Commissioner can meet her burden in connection with the fifth step of the relevant disability test by utilizing the grid.  *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999); *Bapp v. Bowen*, 802 F.2d

-44-

601, 604 (2d Cir. 1986).  The grid takes into consideration a claimant's

RFC, as well as his or her age, education and work experience, in order to

determine whether he or she can engage in substantial gainful work in the

national economy.  *Id.*  Whether or not the grid should be applied in order

to make a step five determination presents a case-specific inquiry which

depends on the particular circumstances involved.  *Bapp*, 802 F.2d at 605.

If a plaintiff's situation fits well within a particular classification, then resort

to the grid is appropriate.  *Id.*  If, on the other hand, nonexertional

impairments, including pain, <u>significantly</u> limit the range of work permitted

by exertional limitations, then use of the grid is inappropriate, in which

case further evidence and/or testimony is required.[13]  *Rosa*, 168 F.3d at

78; *Bapp*, 802 F.2d at 605-06.

Based upon a finding that despite his limitations plaintiff retains the

ability to perform a full range of light work, and given his age and

education, the grid fully supports the finding of no disability, regardless of

---

[13]     As one court has explained,

> [a] nonexertional limitation is one imposed by the claimant's
> impairments that affect [his or] her ability to meet the
> requirements of jobs other than strength demands, and
> includes manipulative impairments and pain.

*Sobolewski*, 985 F. Supp. at 310 (citing 20 C.F.R. § 404.1569(a), (c)).

whether it is applied as of the date that his disability ceased – April 30,

1998 – or instead the date of the hearing.  *See* 20 C.F.R. Pt. 404, Subpt.

P, App. 2, Rules 202.10, 202.20.

IV.    SUMMARY AND RECOMMENDATION

        While somewhat disadvantaged as a result of plaintiff's failure to

submit a brief outlining the areas of his disagreement with the

Commissioner's finding of medical improvement and no disability, I have

reviewed those findings in light of the extensive record before the court,

addressing any conceivable arguments which could potentially be made

on his behalf, and nonetheless find that the determination of medical

improvement was arrived at based upon application of proper legal

principles, and is supported by substantial evidence.

        It is therefore hereby

        RECOMMENDED that defendant's motion for judgment on the

pleadings be GRANTED, the Commissioner's finding of medical

improvement and no disability be AFFIRMED, and plaintiff's complaint be

DISMISSED in its entirety.

        NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections shall be filed

with the Clerk of the Court within ten (10) days.  FAILURE TO SO

OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*,

984 F.2d 85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy

of this Report and Recommendation upon the parties by regular mail.

Dated:     November 2, 2005
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

G:\socialsecurity\termination of benefits\tucker.wpd

-47-